

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

DEL/EJD
F. #2024R00674

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

June 9, 2026

By ECF

The Honorable Margo K. Brodie
United States District Court, Chief Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

> Re:   United States v. Joseph Cutaia
> Criminal Docket No. 24-501 (MKB)

Dear Chief Judge Brodie:

The government respectfully submits this letter in advance of the sentencing for defendant Joseph Cutaia in the above-captioned case, which is scheduled for June 16, 2026, at 10:30 a.m.[1]  On October 30, 2025, the defendant pleaded guilty, pursuant to a plea agreement, to Hobbs Act extortion conspiracy (Count One), attempted Hobbs Act extortion (Count Four), and transportation of stolen property (Count Six), in connection with a scheme to extort certain businesses and their owners for payment.  The defendant's advisory sentencing range under the United States Sentencing Guidelines ("U.S.S.G" or "Guidelines") is 57 to 71 months' imprisonment.

However, as detailed herein, the Guidelines range does not adequately address: (1) the seriousness of the defendant's criminal history and the likelihood that he will commit other crimes; (2) the seriousness of the defendant's conduct; (3) the defendant's flagrant disregard for the law and potential danger to the community; and (4) the need for deterrence.  See U.S.S.G. § 4A1.3; 18 U.S.C. §§ 3553(a)(1), (a)(2)(A)-(C).  Accordingly, the government respectfully recommends an above-Guidelines sentence of 87 months' imprisonment, forfeiture in the amount of $210,000, and a restitution award in the amount of $90,000.

---

[1]     Cutaia is expected to be sentenced on his related violation of supervised release on Friday, June 12, 2026, before the Honorable Eric N. Vitaliano.

I.       Background

A.  The Offense Conduct

In 2023 and 2024, while Cutaia was in prison and on federal supervised release, Cutaia and his co-conspirators targeted businesses and their owners to collect extortionary payments through repeated threats of violence.  From one New York-based business owner ("John Doe #1"), Cutaia collected approximately $50,000 over several months.  From another Brooklyn-based business owner ("John Doe #2"), Cutaia demanded thousands from the company's accounts and then stole two luxury watches at gunpoint after John Doe #2 and others failed to pay him. Cutaia relied on fear, intimidation and threats of violence to get what he wanted — money.

1.  John Doe #1

Beginning in approximately August 2023, while still in prison, Cutaia contacted John Doe #1 by phone and demanded John Doe #1 send money to Cutaia's spouse. PSR ¶ 9. John Doe #1 had never met Cutaia before but knew from others of Cutaia's ties to the Lucchese organized crime family and that Cutaia had personally committed violent home invasion and robbery.  Id.  John Doe #1 also knew Cutaia was currently incarcerated.  Fearing what would happen if he refused, John Doe #1 paid Cutaia $850.  Id.

Following his release from prison in late 2023, Cutaia's contacts and threats to John Doe #1 intensified.  Id. ¶ 10.  In one instance, Cutaia flaunted his mafia connections.  On December 11, 2023, Cutaia sent John Doe #1 the following screenshot from a "Mob Facts" webpage, stating that Cutaia is an associate of the Lucchese crime family:  "Lucchese Crime family Associate Joseph Cutaia (T-L) Son of Soldier Salvatore (B-R) & Grandson of deceased Various Crew CAPO Domenico (B-L) has been released from Prison.  Speculated to be a future force to be reckoned with." An image of the photo sent by Cutaia is below:



2

Cutaia also traveled to John Doe #1's offices in New York to demand John Doe #1 pay him or hire him.  Id. ¶ 11.  In one of these visits, Cutaia and a co-conspirator ("Co-Conspirator #1") traveled to Cutaia's office with another individual ("John Doe #2") to discuss the possibility of John Doe #1 and John Doe #2 working together.  Id.  Cutaia and Co-Conspirator #1 explained to both John Doe #1 and John Doe #2 that if they worked together and profited, a portion of the profits were to be provided to Cutaia for "referring" the business.  Id.

Many of Cutaia's communications to John Doe #1 included threats as to what would happen if John Doe #1 did not comply with Cutaia's demands.  Id. ¶ 12.  For example, on April 18, 2024, Cutaia sent John Doe #1 the following messages between 4:09 p.m. and 4:27 p.m.:

| Cutaia: | Fuck your [sic] |
|---|---|
| Cutaia: | Don't worry |
| Cutaia: | I will see you very soon |
| . . . | |
| Cutaia: | I don't care who's listening Im going to put you under that building |
| . . . | |
| Cutaia: | You want to make this go away send my wife 10.000 and you will never hear from me again don't send it I promise you your [sic] going to see me real soon I don't let no one talk crazy to me not my family not my friends and definitely not you |
| Cutaia: | I'm not paying [sic] with you |
| Cutaia: | I swear to god |
| . . . | |
| Cutaia: | Your lucky I only made you send that |
| . . . | |
| Cutaia: | Send it to [spouse's name] |
| Cutaia: | Maybe next time you will think before you speak |

Id. ¶ 12.

On June 4, 2024, Cutaia was stopped for erratic driving and arrested by officers from La Porte County Sheriff's Department in Indiana.  On June 11, 2024, Cutaia contacted his spouse on a recorded line and directed his spouse to contact John Doe #1 and demand he send

Cutaia $400 "right now." Id. ¶ 15. Cutaia dictated the message to John Doe #1, telling his spouse to tell John Doe #1: "If you can't send it right now, let me know, because, then ah, I think [name of a member of the Lucchese crime family] gonna come by the office tomorrow to come holler at you." Id. When his spouse asked him to repeat the message to John Doe #1, Cutaia explained again: "Say if you can't send the four right now, he can send [Lucchese member] to the office tomorrow to pick it up." Id. As directed, Cutaia's spouse then contacted John Doe #1 and told John Doe #1 that Cutaia was in prison but would be home in a few days and needed $1,000 "right now." Id. ¶ 13. Cutaia's spouse explained, "He said if you can't send it now he can send [Lucchese member's name] to the office to get it tomorrow." Id.

In 2023 and 2024, John Doe #1 sent Cutaia approximately $50,000 in payments.

2. John Doe #2

John Doe #2 is the co-owner of a merchant cash advance business based in Brooklyn, New York. Id. ¶ 16. On Thursday, April 18, 2024, Cutaia arrived at the business's office unannounced and indicated he had a gun. Id. ¶ 17. Cutaia told the occupants of the office if they called the police, he would "spray the place." Id. Cutaia forced John Doe #2 and others into the office's back room. Id. In the back room, Cutaia repeatedly yelled that the men owed him at least $100,000 from the business's bank accounts. Id. Cutaia repeatedly told the men that if they did not pay him, he would "come after" them. Id. Cutaia then demanded John Doe #2 give him his watch, a Rolex Daytona with a gold face and black leather wristband. Id. Cutaia also demanded another individual ("John Doe #3") give him his watch, a Patek Philippe Nautilus. Id. Cutaia then threatened them that if they spoke with law enforcement, he would retaliate against them. Id.

At approximately 2:00 p.m. that day, Cutaia filmed a video of two watches matching the description of the stolen watches. Id. ¶ 18. Cutaia also received several messages from others concerning the locations of jewelry stores, at which Cutaia could presumably sell the watches. Id. Later that day, he took a selfie-style photograph at a jewelry store in Manhattan. Id. On or about April 18, 2024, after taking the watches from John Doe #2 and John Doe #3, Cutaia sent photographs of the watches to another individual, noting "the one is worth 120,000 and the rolex is 40000. I want 100000." Id.

Cutaia traveled from New Jersey to Brooklyn to commit the robbery, and following the robbery, he traveled back to New Jersey. Finally, at approximately 10 p.m. that evening, Cutaia traveled from New Jersey to Staten Island, and during the drive (right after entering Staten Island), took a photograph of himself wearing the stolen watches.

The following month, John Doe #2 saw Cutaia at a business in Staten Island. According to John Doe #2, at that encounter, Cutaia put a large, silver handgun inside the waistband of his pants and then told John Doe #2 that he planned to kill two individuals — one man who was refusing to meet with Cutaia and another who he blamed for his prior federal conviction in 2011.

4

### 3.  Conduct Following His June 2024 Arrest

Following his arrest in June 2024, Cutaia repeatedly issued directives to others to destroy evidence and frustrate the government's investigation before charges were brought in December 2024.  For example, in a monitored call on June 5, 2024, Cutaia asked his spouse if she "hid" the other thing he gave her, and later, on June 7, 2024, directed her to "get rid of the rose gold Daytona with the black leather band"—a watch matching the description of one of the watches Cutaia stole on April 18, 2024.  In another monitored call on June 24, 2024, Cutaia asked his spouse if she "could shut [his] iCloud off" and she responded that she "disabled [his] phone yesterday."

Cutaia has also sought to have an organized crime associate appear at the federal courthouse while a Grand Jury was in session. In a monitored call on July 8, 2024, he told his spouse to tell a named member of the Lucchese crime family that "they are having a grand jury for me on the 25th and he [Cutaia] says he wants you to make sure everything is all right because he doesn't need nobody coming to court and making up lies about him."  In other words, Cutaia directed the associate to appear at the courthouse to notify any witness that he had the full force of the crime family behind him and to discourage anyone from cooperating with law enforcement in their investigation.

### B.  Other Conduct While on Supervised Release

Cutaia has also pleaded guilty to violating his supervised release during the same time period he threatened and extorted his victims and is currently awaiting sentencing on those violations.  Cutaia's actions during the seven-month period he was on supervised release further illustrate his history and characteristics.  See generally PSR ¶ 58, at 21-22.

On December 1, 2023, Cutaia began his term of supervised release related to his multiple violent armed robberies in this District, see United States v. Cutaia, No. 10-CR-10 (E.D.N.Y.).  Between February and June 4, 2024 — approximately four months — Cutaia was arrested or detained by law enforcement officers at least seven times, including in serious motor vehicle accidents where he operated a car or a motorcycle without a valid driver's license, in several suspected domestic violence calls involving family members, and in other circumstances where he possessed controlled substances and weapons.  In nearly every encounter, Cutaia lied to law enforcement officers about his name and other identifying information to avoid detection or further charges. He currently faces local charges in connection with several incidents in Staten Island, Aberdeen, New Jersey, and Colts Neck, New Jersey.

Just two months after beginning his term of supervision, Cutaia was arrested in Staten Island on February 29, 2024. During the encounter with police, Cutaia told the officer his name was "Joseph DeGerolamo" and that he had a suspended driver's license. The officers observed a switchblade on the front passenger seat, a concealed knife, and a small quantity of suspected drug residue (which tests later determined was in fact cocaine) in a straw. Cutaia was subsequently charged in Richmond County criminal court with criminal possession of a controlled substance in the seventh degree (a misdemeanor), and two infractions and released on his own recognizance. Cutaia failed to appear in court as directed, and on April 25, 2024, a bench warrant was issued for his arrest.

5

On March 13, 2024, Cutaia was involved in a significant car accident in Colts Neck, New Jersey. According to a witness, Cutaia swerved into another driver. He still did not have a valid driver's license. When questioned by police officers on scene, Cutaia said his name was "Salvatore Cutaia" (a name that, as shown on body camera footage, he carefully spelled out letter by letter), provided a fake birth date and claimed he did not know his home address. He denied having identification.

In March and May 2024, local police twice responded to emergency calls regarding domestic disputes at the house where Cutaia resided. In both incidents, Cutaia claimed his name was "Joseph Montecalvo." After the May incident, a relative obtained a restraining order against him.

On June 2, 2024, Cutaia was stopped by an officer of the Aberdeen Police Department in New Jersey and, after providing a false name and date of birth, sped away from the scene causing the police to pursue him in a high-speed chase. For that incident, Cutaia was charged with resisting arrest/eluding an officer in the second degree and obstructing the administration of law or other governmental function in the fourth degree, both misdemeanors.

On June 4, 2024, Cutaia was stopped for erratic driving by officers from La Porte County Sheriff's Department in Indiana. During the interaction with the officers, Cutaia provided a false name and date of birth, and professed not to know his address and claimed he did not have his driver's license.

C. Procedural History

On December 5, 2024, a grand jury sitting in the Eastern District of New York returned a six-count indictment against Cutaia, charging him with Hobbs Act extortion conspiracy in violation of 18 U.S.C. § 1951(a) (Count One), Hobbs Act extortion in violation of 18 U.S.C. § 1951(a) (Count Two), the use of a facility of interstate commerce to commit extortion in violation of 18 U.S.C. § 1952(a)(3)(A) (Count Three), attempted Hobbs Act extortion in violation of 18 U.S.C. § 1951(a) (Count Four), the use of a facility of interstate commerce to commit extortion in violation of 18 U.S.C. § 1952(a)(3)(A) (Count Five), and interstate transportation of stolen property in violation of 18 U.S.C. § 2314 (Count Six).

On October 30, 2025, Cutaia pleaded guilty pursuant to a plea agreement to Counts One, Four and Six. In the plea agreement, Cutaia stipulated to the government's estimated Guidelines calculation of 63 to 78 months (CHC II x Offense Level 25). Plea Agreement ¶ 2. He also agreed not to appeal the sentence or conviction should the Court impose a term of 87 months' imprisonment or below. Plea Agreement ¶ 4.

D. The Defendant's Criminal History

Cutaia's criminal history is extensive. PSR ¶¶ 49-58. His convictions include attempted petit larceny (1995); petit larceny (1995); sexual abuse in the first degree by forcible compulsion (1996); resisting arrest (2001); disorderly conduct (2003), burglary in the second degree (2003); possession of a forged instrument in the second degree (2004); and attempted burglary in the third degree involving illegal entry with intent to commit a crime (2005).

6

In December 2009, Cutaia was arrested in connection with his involvement in multiple violent armed robberies in this District, see Cutaia, No. 10-CR-10 (E.D.N.Y.), along with members and associates of the Lucchese crime family of La Cosa Nostra, a criminal enterprise that engages in violent crimes, extortion, loansharking, drug trafficking and fraud.  While armed, Cutaia brought restraints to the homes of two victims he sought to rob. In one incident, he tied down and robbed an elderly woman in her home. In another incident, while Cutaia and others attempted to restrain another victim at his home, the victim escaped, causing Cutaia and his associates to attempt to shoot the fleeing victim.

On April 1, 2011, Cutaia pled guilty, pursuant to a plea agreement, to two counts of conspiracy to commit Hobbs Act robbery, in violation of 18 U.S.C. § 1951(a) (Counts Twenty-Three and Twenty-Four of a superseding indictment) and unlawful use of a firearm, in violation of 18 U.S.C. § 924(c)(1)(A)(iii) (Count Twenty-Six).  See Cutaia, 10-CR-10, ECF Dkt. No. 188.[2] Cutaia was sentenced to 240 months' imprisonment and three years' supervised release.

On June 27, 2016, Cutaia sought to vacate his conviction on the firearms count (Count Twenty-Six), which was no longer based on a valid predicate crime of violence.  See Cutaia, 10-CR-10, ECF Dkt. No. 433. On March 3, 2021, the Court vacated the Cutaia's sentence and conviction on Count Twenty-Six.  See Cutaia, 10-CR-10, ECF Dkt. No. 491. On February 4, 2023, the Court re-sentenced Cutaia to 180 months' imprisonment on Counts Twenty-Three and Twenty-Four, to run concurrently, to be followed by three years' supervised release on each count, to run concurrently.

The government's investigation indicates Cutaia still has significant ties to the Lucchese organized crime family.  In addition to his circulation of the article from the website "Mob Facts," noting the release of "Lucchese associate Joseph Cutaia," toll records and monitored prison calls in 2024 indicate that Cutaia is in contact with several previously convicted members and associates of organized crime.

## II.     Guidelines Calculation

The government believes the following Guidelines calculation is correct:

<u>Count One</u>:     <u>Hobbs Act Extortion Conspiracy (John Doe #1)</u>

Base Offense Level (U.S.S.G. § 2B3.2(a))                                              18

---

[2]     In addition to the robberies charged in Counts Twenty-Three and Twenty-Four, between approximately 2002 and 2009, the government's case indicated that Cutaia was involved in multiple additional armed robberies of individuals he believed to be involved in illegal activities such as narcotics trafficking and bookmaking.  During these robberies, the Cutaia and his co-conspirators threatened the victims with guns and knives, restrained them with zip ties, and in certain instances, physically assaulted and even shot the victims. Cutaia, 10-CR-10, ECF Dkt. No. 506.

| | | |
|---|---|---|
| Plus: | Offense involved an express or implied threat of death or bodily injury (U.S.S.G. § 2B3.2(b)(1)) | +2 |
| Plus: | Amount demanded is greater than $20,000 (U.S.S.G. §§ 2B3.2(b)(2), 2B3.1(b)(7)(A)) | +1 |
| Plus: | Obstruction of Justice (U.S.S.G. § 3C1.1(1)) | +2 |
| Plus: | Aggravating Role (U.S.S.G. § 3B1.1(c)) | +2 |
| Total: | | <u>25</u> |

Counts Four/Six:  <u>Attempted Hobbs Act Robbery Extortion (John Doe #2) & Transportation of Stolen Property</u>

| | | |
|---|---|---|
| Base Offense Level (U.S.S.G. § 2B3.2(a)) | | 18 |
| Plus: | Offense involved an express or implied threat of death or bodily injury (U.S.S.G. § 2B3.2(b)(1)) | +2 |
| Plus: | Amount demanded is greater than $95,000 (U.S.S.G. §§ 2B3.2(b)(2), 2B3.1(b)(7)(C)) | +2 |
| Plus: | Obstruction of Justice (U.S.S.G. § 3C1.1(1)) | +2 |
| Total: | | <u>24</u> |

<u>Multiple Count Analysis (§§ 3D1.1 – 3D1.4)</u>

| | | |
|---|---|---|
| Highest Offense Level | | 25 |
| | Units: | |
| | Count One: | 1 |
| | Counts Four/Six: | 1 |
| Plus: | Grouping Units (U.S.S.G. § 3D1.4(a)) | <u>+2</u> |
| Total: | | <u>27</u> |
| Minus: | Acceptance of Responsibility (U.S.S.G. § 3E1.1) | <u>-3</u> |
| Total: | | <u>24</u> |

With an adjusted offense level of 24 and Criminal History II, the applicable Guidelines range of imprisonment is 57 to 71 months' imprisonment.

8

The calculation differs slightly from the PSR: (1) it did not include an enhancement for obstruction of justice, which the government believes properly applies here and was set out in the Plea Agreement, and (2) it mistakenly noted that the government does not intend to seek the third acceptance point, which it does.

The calculation differs slightly from the plea agreement, in that the plea agreement (1) did not group Counts Four and Six and (2) incorrectly applied the aggravating role enhancement after the grouping analysis.  See U.S.S.G. 1B1.1(a) (directing that the adjustments for role are applied before the grouping analysis).

### III.    Applicable Law

The standards governing sentencing are well-established. In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court rendered the Guidelines advisory, and emphasized that a sentencing court must consider both the Guidelines and the 18 U.S.C. § 3553(a) factors when making a sentencing decision. Id. at 264; see also United States v. Kimbrough, 552 U.S. 85 (2007) (stating that "the Guidelines, formerly mandatory, now serve as one factor among several courts must consider in determining an appropriate sentence").

However, that the Guidelines are non-binding does not render them irrelevant to the imposition of an appropriate sentence. In Gall v. United States, 552 U.S. 38 (2007), the Supreme Court instructed that the sentencing court should calculate the Guidelines range, permit the government and the defendant "an opportunity to argue for whatever sentence they deem appropriate," consider all of the § 3553(a) factors, and finally pronounce a sentence taking into account all of the relevant factors. Id. at 596-97.  In so doing, the court "may not presume that the Guidelines range is reasonable but must make an individualized assessment based on the facts presented." Id. at 590.

The Supreme Court further instructed that, in the event that the sentencing court decides to impose a variance sentence, the court "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." Id. (noting that a "major departure should be supported by a more significant justification than a minor one"). When "rendering a sentence, the district court must make and place on the record an individualized assessment based on the particular facts of the case." United States v. Carter, 564 F.3d 325, 328 (4th Cir. 2009).  Ultimately, the court "must state in open court the particular reasons supporting its chosen sentence." Carter, 564 F.3d at 328 (quoting 18 U.S.C. § 3553(c)).

Title 18, United States Code, Section 3553(a) provides that, in imposing a sentence, the Court shall consider:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed—
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

9

(B) to afford adequate deterrence to criminal conduct; [and]

(C) to protect the public from further crimes of the defendant.

At sentencing, "the court is virtually unfettered with respect to the information it may consider." United States v. Alexander, 860 F.2d 508, 513 (2d Cir. 1988). Indeed, 18 U.S.C. § 3661 expressly provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."

IV.    Argument

The government respectfully submits that an above-Guidelines sentence of 87 months' imprisonment is appropriate in view of the defendant's violent extortion scheme and harm to his victims, the defendant's recidivism and lengthy criminal history, his association with a violent organized crime family, and the need to protect the public and for deterrence. In short, an above-Guidelines sentence is what justice requires.

A.    Nature and Circumstances of the Offense

Cutaia's crimes were serious. Cutaia did not know John Doe #1 or John Doe #2. But he had no qualms about threatening to kill two strangers if they didn't agree to pay him. Cutaia targeted them because they operated a specific type of cash-rich business and because he believed they would pay when he demanded it. When John Doe #1 expressed reluctance about agreeing to meet with him, Cutaia told John Doe #1, "Fuck you . . . Don't worry. I will see you very soon." Cutaia added: "I don't care who's listening [I'm] going to put you under that building." Then when John Doe #1 agreed to pay, Cutaia chastised him, saying, "Maybe next time you will think before you speak." When John Doe #1 even appeared uncooperative, Cutaia's message to him was clear: Refuse and you will be killed. Cutaia ensured that for months, John Doe #1 lived in fear. When John Doe #2 did not pay Cutaia the large sum of money he demanded, Cutaia showed up at his office with a gun and threatened to "spray the place" if John Doe #2 called the police. Then Cutaia stole the luxury watches off the arms of John Doe #2 and John Doe #3 and offered those watches to other members of organized crime for $100,000. Cutaia's threats were so convincing that even after having been threatened and robbed at gunpoint, John Doe #2 did what Cutaia said — he did not call the police.

Cutaia also relied on his association with the Lucchese crime family to manipulate his victims. He circulated Internet postings about his status with the Lucchese crime family. He mentioned other crime family figures by name, knowing that these names would resonate with his victims and provide the imprimatur of the crime family. While his own reputation was fearsome, he knew that the mention of the Lucchese crime family would further terrorize his victims.

This conduct warrants a significant term of imprisonment. In the short time that Cutaia was released from prison, he preyed on innocent, hard-working individuals. Cutaia made them believe, with his words and actions, that Cutaia would hurt or kill them if they didn't pay. And, although Cutaia never resorted to physical harm against his victims, his threats, backed by the reputation and strength of organized crime, were enough to ensure his victims stayed in line.

10

B.  History and Characteristics

Cutaia's history and characteristics weigh in favor of an above-Guidelines sentence.  Here, Cutaia's criminal history underrepresents the seriousness of the defendant's past criminal conduct.  See PSR ¶ 124 (noting basis for upward departure); See United States v. Glenn, 629 F. App'x 150, 151 (2d Cir. 2015) ("[A]n upward variance from a defendant's Guidelines range is warranted where the range underrepresents the defendant's criminal history and importantly, likelihood of recidivism."). The instant conviction is Cutaia's tenth criminal conviction.  However, only one of those 10 convictions counts toward Cutaia's criminal history category, because he has been incarcerated since 2009 (the entirety of the 15-year lookback period).  Nor have the numerous sentences and terms of supervision imposed in past cases deterred Cutaia from criminal activity.  Indeed, his post-release supervision conduct since his 2023 release further emphasizes this lack of deterrence.  His criminal history began when he was 16 years old; he is now 47.

Courts have found similar facts warrant an upward departure.  See, e.g., United States v. Garcia, 528 F. App'x 57, 60 (2d Cir. 2013) ("The district court reasonably concluded that [the defendant's] entire criminal history, including his juvenile misconduct, demonstrated a heightened risk of recidivism, requiring an upward variance specifically to deter [the defendant] from committing future crimes."); United States v. Washington, 362 F. App'x 179, 180–81 (2d Cir. 2010) (upward departure warranted where, among other things, certain prior convictions were too old to be counted and the defendant had committed offenses similar to the instant offense that did not result in convictions); United States v. Bolling, 81 F. App'x 373, 376 (2d Cir. 2003) (affirming district court's upward departure for a defendant with 13 prior convictions (only two of which fell within the relevant 15-year-old period) and numerous attempts to deter the defendant have been futile); United States v. Morris, 350 F.3d 32, 37 (2d Cir. 2003) (affirming district court's upward departure to a higher criminal history category "in light of defendant's pattern of exploitation"); see also Sinclair v. United States, No. 23-CR-00503 (PMH), 2026 WL 607856, at *9 (S.D.N.Y. Mar. 3, 2026) (denying relief under 28 U.S.C. § 2255 for imposition of upward departure because defendant's "criminal history score understated the severity of his criminal history").

Cutaia's actions indicate that he has committed to a life of crime. Cutaia began his campaign of intimidation against John Doe #1 while he was still serving a 15-year sentence for committing multiple, violent home invasions-robberies.  Cutaia determined, even before he was released from a lengthy prison sentence, that he wouldn't attempt to reintegrate into society, but that he would instead continue to take money by force and intimidation.

C.  Protecting the Public and Affording Deterrence

An above-Guidelines sentence would protect the public from the defendant and keep him from committing additional crimes once released.  Cutaia's last conviction in this District involved several armed robberies.  In one, Cutaia zip-tied the elderly owner of a private residence at gunpoint while he and co-conspirators stole nearly $20,000 in jewelry.  PSR ¶ 58. In another, Cutaia physically restrained the spouse of another target and when the victim escaped, one of his co-conspirators fired gunshots at the escaping victim.  PSR ¶ 58.  Then, while serving the prison term imposed in that case, Cutaia garnered thirteen disciplinary infractions while incarcerated for violations including assault, possessing a dangerous weapon, use of drugs/alcohol and refusing to

11

obey an order.  Id.  When released, Cutaia began threatening John Doe #1 and others and arming himself with firearms.  As his history shows, when Cutaia wants something, he simply takes it by threat of force or outright physical violence.

Cutaia has also made no attempt to comply with even the most basic conditions of his supervised release — attend a drug treatment program, keep in contact with his probation officer and report contact with law enforcement.  Within a month of his release, he tested positive for controlled substances.  Within two months, he left a drug treatment program against medical advice.  Within three months, he cut off contact with his probation officer.  Within six months, he had five interactions with various law enforcement agencies, was arrested on more than one occasion and charged in other jurisdictions.

D.  Promoting Respect for the Law and Providing Just Punishment

A serious sentence would also promote respect for the law — something that Cutaia has repeatedly failed to demonstrate through the pendency of this case.  Indeed, Cutaia issued multiple directives to others to destroy evidence, including the stolen watches and his iCloud account.  He also tried to recruit another organized crime member to intimidate a grand jury witness outside the courthouse.

On his monitored calls from the Metropolitan Detention Center ("MDC"), Cutaia has continued to make light of the criminal justice system, his potential punishment and make threats about his continued violence when eventually released.  On June 12, 2024, the following conversation was recorded at the MDC:

| | |
|---|---|
| Cutaia: | 10 fucking years, so what? |
| Individual #1: | Who wants to do another, yeah, so what, who wants to 10 years? Stop. |
| Cutaia: | [Individual #1], it's 10 years. |
| Individual #1: | [mimicking Cutaia] Yeah, [Individual #1], it's 10 years. |
| Individual #1: | You spent more time in prison than on the street. |
| Cutaia: | I do eight years and then I'm home. And then you know what I do then? And then, you know what I do then, ha, I gotta do another 10 years? Then it's over, then I come out like John Dillinger.  Ain't nothing stopping me, bye bye black Birdie, bye bye, bye bye. |

A sentence of imprisonment will send a message to the victims in this case and the broader community that those who commit extortions will be punished.

12

E.    The Court Should Reject the Defendant's Request for a Below-Guidelines Sentence

The defendant makes several arguments as to why he should receive a below Guidelines sentence.

First, Cutaia claims that John Doe #1 was a friend and John Doe #2 was a close associate. Def. Mem. at 2. They were not. Neither had ever met Cutaia in person before he began demanding they pay him from the profits of their business. This self-serving claim is belied by the profound harm Cutaia inflicted upon his victims. As the messages on Cutaia's cell phone show, each time Cutaia demanded money from John Doe #1, Cutaia promised it would be the last payment — those are the words and actions of a person who knows he is a predator. John Doe #1 and John Doe #2 were not Cutaia's friends or associates; they were his victims.

Second, Cutaia argues that conditions at the MDC warrant a downward departure, citing the COVID-19 pandemic and two murders that occurred at the MDC in 2024. Def. Mem. at 5. Cutaia describes no specific prison conditions he has endured during his incarceration at MDC. The murders occurred in July 2024 — approximately a year before Cutaia even arrived at the MDC. The cases he cites in which courts permitted lesser sentences given a defendant's incarceration during the COVID-19 pandemic occurred more than five years ago, in 2020 and 2021. Simply put, this is not a basis to depart from the Guidelines and impose a lower sentence. See, e.g., United States v. Thawney, No. 20-CR-428 (WFK), 2022 WL 2132993, at *5 (E.D.N.Y. June 14, 2022) (rejecting request for downward variance based on the defendant's argument that the court should "account for the harsh conditions in which Defendant was incarcerated while in the MDC"); Transcript of Sentencing, Hon. Pamela K. Chen, United States v. Idris Dayo Mustapha, No. 23-CR-440 (E.D.N.Y. May 1, 2024), at 33-34 (noting that the Court is "not going to be convinced by general descriptions of the conditions at the facility or in the BOP system writ large that a variance is warranted for any particular defendant . . . ."). Cutaia has garnered two sanctions at the MDC for possessing a hazardous tool and a non-hazardous tool, both in October 2025.



---

<sup>3</sup> Cutaia has requested that this information be redacted from public view as it reveals health information protected by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") that has not otherwise been disclosed in the defendant's public filings. See Offor v. Mercy Med. Ctr., 167 F. Supp. 3d 414, 445 (E.D.N.Y. 2016) ("Courts in this Circuit have repeatedly held that information protected by HIPAA is not subject to a First Amendment or common- law right of access and thus have sealed docket entries and redacted documents that contain such information."), vacated in part on other grounds, 676 F. App'x 51 (2d Cir. 2017). Accordingly, the government is filing a partially redacted version of this letter with the same request.

13



## V.     Conclusion

For these reasons, the government respectfully requests that the Court impose a sentence of 87 months' imprisonment, forfeiture in the amount of $210,000, and a restitution award in the amount of $90,000.

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney

By:      /s/

Devon Lash
Emily J. Dean
Assistant United States Attorneys
(718) 254-7000

cc:     Gary Cutler, Esq.
United States Probation Department

14